260 F.2d 803
 ATLAS SEWING CENTERS, INC., a corporation, Appellant,
v.
NATIONAL ASSOCIATION OF INDEPENDENT SEWING MACHINE DEALERS, a corporation; Clyde A. Davies, Richard Jensen, B. P. Reese, K. B. Budd, Walter L. Zinc, Lee Tuttle and Ward Hott, Appellees.
 No. 5880.
 United States Court of Appeals Tenth Circuit.
 October 16, 1958.
 
 Albert J. Colton, Salt Lake City, Utah (Peter W. Billings and Bryce E. Roe, Salt Lake City, Utah, were with him on the brief) for appellant.
 Herbert B. Maw, Salt Lake City, Utah, for appellees.
 Bernard P. Reese, Jr., Rockford, Ill., filed a brief for appellee, National Association of Independent Sewing Machine Dealers.
 Before BRATTON, Chief Judge, and PHILLIPS and LEWIS, Circuit Judges.
 PHILLIPS, Circuit Judge.
 
 
 1
 Atlas Sewing Centers, Inc., a Delaware Corporation,[1] brought this action against National Association of Independent Sewing Machine Dealers, a Utah Corporation,[2] and Clyde A. Davies, a citizen of Utah, seeking damages on three claims. Richard Jensen, B. P. Reese, K. B. Budd, Walter L. Zinc, Lee Tuttle and Ward Hott were also named as defendants, but were not served with process.
 
 
 2
 On the first claim Atlas sought damages for an alleged libel; on the second claim it sought damages for alleged civil conspiracy; and on the third claim it sought treble damages under 15 U.S.C.A. § 15, for alleged violations of the antitrust laws of the United States, 15 U.S. C.A. §§ 1-15, inc.
 
 
 3
 The Association is a non-profit corporation, whose members are retail sewing machine dealers. Davies is Executive Vice-President of the Association. The Association publishes a periodical called "The Sewing Machine News." Jensen is the editor of the periodical and is a citizen of Utah. The alleged libel set up in the first claim is predicated on an article published in the October-November, 1956 issue of such periodical, written by Davies and reading as follows:
 
 
 4
 "`You will probably receive a lot of complaints after we open up business here', T. C. Kaplan, executive vice president, Atlas Sewing Centers, Inc. told Hendrich Romeyn, Business Men's Alliance (Better Business Bureau) in his Salt Lake City office yesterday.
 
 
 5
 "Mr. Kaplan called at his office, Mr. Romeyn said, to try to impress him with the bigness and strength of Atlas.
 
 
 6
 "`He showed me a printed prospectus on the financial standing of this corporation he represents. I am a man of considerable experience in stocks and bonds, and I read the report from beginning to end several times, but I'll be darned if I could find who owned what, and what who owned if they owned it. Many prominent names are used, which naturally impressed me, but their actual connection is left very vague,' Mr. Romeyn said.
 
 
 7
 "`As to Mr. Kaplan's warning that my office will likely receive many calls from his customers, this of course only made me wonder why. If a man calls the police department and says he is going to shoot his wife, this does not make the crime any less serious when it happens.
 
 
 8
 "`Regardless of all those fancy names and nine-digited figures in his prospectus, this office will treat complaints against them on their own merits.
 
 
 9
 "`At this point we have no information, except his own, that we may expect trouble, and until we do, we will assume that Atlas will, if it opens up here as he says, operate under the rules of free enterprise and under good business judgment,' Mr. Romeyn concluded."
 
 
 10
 The first claim alleged the foregoing facts and further alleged that Atlas is engaged in numerous cities of the United States in the business of selling and servicing sewing machines, which are purchased from suppliers, who also supply like and similar machines to members of the Association; that the published matter was wholly false and untrue and known by the Association and Davies to be false and untrue; that Atlas had demanded that the Association publish a retraction and that it had failed so to do; that as a result of the publication of such matter, various firms, persons and corporations with whom Atlas had previously been doing business and with whom Atlas had reason to anticipate doing business had refused to do business with Atlas, to its damage in the amount of $50,000; and that the publication of such matter was malicious and done with intent to damage Atlas.
 
 
 11
 The second claim alleged the necessary jurisdictional facts and further alleged that the Association, Davies, and the other named defendants "are associated together for the purpose of furthering and promoting the business of independent sewing machine dealers" and "are in league against the owners and operators of multiple stores engaged in the sale of sewing machines"; that Atlas operates "numerous stores engaged in the sale of sewing machines"; and that in furtherance of the above-stated purposes of the Association, it, Davies, and the other named defendants "did conspire, one with the other" to cause to be published in the October-November, 1956 issue of "The Sewing Machine News" the article above set forth; that the article was false and known to be false by the Association, Davies, and the other defendants and was published in furtherance of such conspiracy "to defame, injure and hurt" Atlas "and deprive" Atlas "of business to which it was justly entitled"; that the Association, Davies, and the other named defendants conspired to circulate "the false and defamatory information to the members" of the Association, with the intent that it should be used by them to induce prospective purchasers of sewing machines not to deal with Atlas; that Atlas has expended considerable sums of money in advertising to create a favorable impression in the mind of the public "for the name of" its "business and the name of" its "product"; and that as a result of the acts of the Association, Davies, and the other named defendants, various firms, persons and corporations with whom Atlas had previously been doing business and with whom it had reason to believe it would do business, refused to do business with Atlas, to its damage in the amount of $50,000; and that the actions of the defendants were malicious and intended to damage Atlas.
 
 
 12
 In the third claim Atlas alleged that it is a Delaware Corporation engaged in the sale of sewing machines and parts and in such connection purchases sewing machines from manufacturers, importers and distributors in the States of New York, Pennsylvania, Florida, Texas and elsewhere in the United States and that it owns and operates retail sales and service stores in the States of Alabama, Arkansas, California, Colorado, Florida, Georgia, Indiana, Kansas, Kentucky, Lousiana, Mississippi, Nebraska, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia and Utah, and that it had a sales volume in 1956 in excess of $7,000,000; that in carrying on its business Atlas purchases, transports and sells sewing machines bearing the trade name "Atlas" in interstate commerce; that the Association is a trade association of sewing machine dealers engaged throughout the United States in competition with Atlas in the purchase and sale of sewing machines; that the Association, Davies, and the other named defendants, "through collaboration, cooperation and conspiracy have entered into a plan or scheme to unreasonably restrict and restrain the business of purchasing and selling sewing machines in interstate commerce by a program of publishing false and defamatory information about" Atlas and its "products," to induce Atlas's suppliers and customers not to deal with it, for the unlawful purpose of eliminating Atlas's competition in the purchase and sale of sewing machines in interstate commerce; that the effect and purpose of such plan or scheme "is to injure the public by the elimination of" Atlas "as a substantial supplier and dealer in sewing machines and to enable" the Association and its members "to fix and control the price and market of sewing machines in interstate commerce"; that the acts of the Association, Davies, and the other named defendants "have injured the business and property of" Atlas "by alienating its suppliers and customers and destroying the value" of Atlas's expensive advertising program in radio, television and magazines circulated in interstate commerce, "to establish in the public's mind the merit and quality of" the name "Atlas" as applied to its business and the sewing machines it markets, and that the Association, Davies, and the other named defendants threatened to continue such program of publishing and circulating such false and defamatory matter concerning Atlas, its business and its products, to the further injury and damage to Atlas.
 
 
 13
 Atlas also sought injunctive relief in each claim.
 
 
 14
 Answers to requests for admissions of fact and the deposition of Davies, taken by Atlas, established the following additional facts:
 
 
 15
 The Association prints between 5,000 and 10,000 copies of each issue of "The Sewing Machine News" and sends copies to both members and nonmembers. The alleged libelous article was published in the October-November, 1956 issue. It was written by Davies from information furnished him by Romeyn, because Romeyn felt that Atlas was an "undesirable organization to come into Salt Lake City" and that it "might be harmful to the people here the same as National Stores had been" and steps should be taken to "stop a recurrence of the National Stores deal." In a letter dated December 11, 1956, from the Association to attorneys for Atlas and signed by Davies as Executive Vice-President it was stated that the Association was maintaining files with respect to Atlas; that it had received demands from large groups that it expose the Atlas "Racket"; and that in order to protect itself it would open up its files to the public through the columns of "The Sewing Machine News."
 
 
 16
 From Davies' testimony it appeared that the Association sent out a circular letter to all of its members, seeking information with respect to complaints against Atlas; that it maintained files of all complaints received against Atlas; and that it had contemplated seeking information from the Federal Trade Commission with respect to complaints filed with the Commission against Atlas.
 
 
 17
 There was published in the December, 1956-1957 issue of "The Sewing Machine News" an article entitled "Kaplan Denies Talking to Hendrik Romeyn." It admitted that Kaplan denied he had talked to Romeyn and stated that a check with Romeyn showed that Kaplan talked to someone else in the Business Men's Alliance office, who, in turn, furnished information to Romeyn. The article in nowise retracted the remainder of the alleged libelous article.
 
 
 18
 An article was published in the February-March, 1957 issue of "The Sewing Machine News" concerning Atlas. Davies testified that it was a reprint from a newspaper article. The original article stated that the Richland Parish Grand Jury had indicted five salesmen representing a Baton Rouge sewing machine from on fraud charges and that the men were listed as agents of the Atlas Sewing Machine Company of Baton Rouge. As republished in "The Sewing Machine News" the headline and the body of the article were changed so as to state as a fact and give emphasis thereto that the salesmen were agents of Atlas.
 
 
 19
 The Association and Davies interposed a motion for a summary judgment. The trial court granted the motion under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A., on the ground that the alleged libelous article was not libelous. The court gave no reason for granting a summary judgment on the second and third claims.
 
 
 20
 The purpose of Rule 56 is to permit expeditious disposition of cases where no substantial issue of fact is presented for determination. It is intended to permit the trial court to pierce formal allegations of fact in pleadings and grant relief by summary judgment when it appears from uncontroverted facts set forth in affidavits, depositions or admissions on file that there are no genuine issues of fact for trial.[3] But it is not intended that litigants shall be deprived of their right to a full hearing on the merits, if any real issue of fact is tendered and "the power to pierce the flimsy and transparent factual veil should be temperately and cautiously used lest abuse reap nullification."[4]
 
 
 21
 In Malouf v. Metropolitan Life Ins. Co., 75 Utah 175, 283 P. 1065, 1069, the court said:
 
 
 22
 "* * * the authorities generally are to the effect that false and defamatory matter calculated to do harm, and published of and concerning another's trade, profession, or employment, is libelous per se, 36 C.J. 1180 et seq., Odgers, Libel & Slander (5th Ed.) 371, * * *. It is recognized that some defamatory and derogatory matter published merely of and concerning one generally may not be of such character as to be libelous per se, yet, when published of and concerning his business, profession, or employment, may well be so regarded."
 
 
 23
 Section 561(1) of the Restatement of the Law of Torts reads:
 
 
 24
 "§ 561. Defamation of Corporation.
 
 
 25
 "(1) One who falsely, and without a privilege to do so, publishes of a corporation for profit matter which tends to prejudice it in the conduct of its trade or business or to deter third persons from dealing with it, is liable to the corporation * * *."
 
 
 26
 The Restatement was quoted with approval by this court in Utah State Farm Bureau Federation v. National Farmers Service Union Corp., 10 Cir., 198 F.2d 20, 22, 33 A.L.R.2d 1186.
 
 
 27
 Section 614 of the Restatement of the Law of Torts reads, in part, as follows:
 
 
 28
 "§ 614. Determination of Meaning and Defamatory Character of Communication.
 
 
 29
 "(1) The court determines whether a communication is capable of a defamatory meaning.
 
 
 30
 "(2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient."[5]
 
 
 31
 Where the language is susceptible of two meanings, one defamatory and the other not, it is for the jury to decide whether or not it was used in the defamatory sense.[6] It is only when the court can say that the language is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense, that the court can rule as a matter of law that it is not defamatory.[7]
 
 
 32
 In determining whether a publication is libelous, it must be measured by its probable effect upon the mind of the average reader.[8] In determining whether an article is libelous, it must be considered in its entirety and such construction must be placed upon the words as may be derived from the whole scope and apparent object of the writer.[9]
 
 
 33
 The article, when considered as a whole, is fairly susceptible of the meaning that Atlas admitted to Romeyn, Manager of the Business Men's Alliance, a Better Business Bureau in Salt Lake City, having for its purpose the exposing of false and misleading advertising and the affording of protection against improper and sharp business practices, that the Better Business Bureau would receive a lot of complaints from persons with respect to the business operations, methods and practices of Atlas; that Atlas could no more exculpate itself from its improper business practices by admitting them in advance than a man can exculpate his crime of shooting his wife by first calling the police department and telling it he is going to shoot his wife; that Atlas tried to overawe Romeyn and the Better Business Bureau by impressing Romeyn with the bigness, strength and financial standing of Atlas, to prevent the Better Business Bureau from entertaining such complaints; and that Atlas issued a prospectus on its financial standing, on its face impressive, with fancy names and nine-digited figures, but which was purposefully vague and unintelligible.
 
 
 34
 So construed, we think the article necessarily would prejudice Atlas in the conduct of its business and deter third persons from dealing with it and would be libelous per se.
 
 
 35
 In his brief counsel for Davies argues that the article was qualifiedly privileged.
 
 
 36
 We deem it unnecessary to determine whether the article would be qualifiedly privileged under any circumstances. It is sufficient to say that qualified privilege is inconsistent with the existence of express or actual malice. In order for a publication to be qualifiedly privileged there must be present both an occasion of privilege and the use of that occasion in good faith, and the publication is actionable if actuated by express malice.[10]
 
 
 37
 Here, express or actual malice was alleged in both the first and second claims.
 
 
 38
 Accordingly, we conclude that there were present genuine issues of fact and that the trial court erred in granting summary judgment.
 
 
 39
 The judgment is reversed and the cause remanded for further proceedings consistent herewith.
 
 
 
 Notes:
 
 
 [1]
 Hereinafter called Atlas
 
 
 [2]
 Hereinafter called the Association
 
 
 [3]
 Schreffler v. Bowles, 10 Cir., 153 F.2d 1, 3; Avrick v. Rockmont Envelope Co., 10 Cir., 155 F.2d 568, 571
 
 
 [4]
 Avrick v. Rockmont Envelope Co., 10 Cir., 155 F.2d 568, 571
 
 
 [5]
 In the comment to § 614 it is stated:
 "b. In the determination of the question whether a given communication is defamatory, two questions may arise: first, whether the communication reasonably conveyed the meaning ascribed to it by the plaintiff (see § 563), and, second, whether such meaning is defamatory in character (see § 559). Under the rule stated in this Section, the court determines whether the communication is capable of bearing the meaning ascribed to it by the plaintiff and whether the meaning so ascribed and carried is capable of being defamatory. * * * If, on the other hand, the judge decides that the communication is capable of bearing a meaning which may reasonably be regarded as defamatory, there is the further question for the jury, whether the communication was in fact understood by the recipient thereof in a sense which made it defamatory."
 
 
 [6]
 Washington Post Co. v. Chaloner, 250 U.S. 290, 293, 39 S.Ct. 448, 63 L.Ed. 987; Christopher v. American News Co., 7 Cir., 171 F.2d 275, 279; Estill v. Hearst Pub. Co., 7 Cir., 186 F.2d 1017, 1021; Gadach v. Benton County Co-op. Ass'n., Minn., 53 N.W.2d 230, 232; Meyerson v. Hurlbut, C.A.D.C., 98 F.2d 232, 234, 68 App.D.C. 360, 118 A.L.R. 313
 
 
 [7]
 Meyerson v. Hurlbut, C.A.D.C., 98 F.2d 232, 234, 68 App.D.C. 360, 118 A.L.R. 313; Epstein v. Dun & Bradstreet, 306 Mass. 595, 29 N.E.2d 123; Fahy v. Melrose Free Press, 298 Mass. 267, 10 N.E. 2d 187, 188; Albert Miller & Co. v. Corte, 5 Cir., 107 F.2d 432, 435; Nicholas v. Oklahoma City Mailer's Union No. 30, Okl., 285 P.2d 399, 401
 
 
 [8]
 Marteney v. United Press Ass'n, 10 Cir., 224 F.2d 714, 715; Washington Post Co. v. Chaloner, 250 U.S. 290, 293, 39 S.Ct. 448, 63 L.Ed. 987; Gadach v. Benton County Co-op. Ass'n, Minn., 53 N.W.2d 230, 232; Albert Miller & Co. v. Corte, 5 Cir., 107 F.2d 432, 434, 435
 
 
 [9]
 Marteney v. United Press Ass'n, 10 Cir., 224 F.2d 714, 715; Estill v. Hearst Pub. Co., 7 Cir., 186 F.2d 1017, 1021; Christopher v. American News Co., 7 Cir., 171 F.2d 275, 279
 
 
 [10]
 Camp v. Maddox, 93 Ga.App. 646, 92 S.E.2d 581, 585; Reserve Life Ins. Co. v. Simpson, 9 Cir., 206 F.2d 389, 390; Stroud v. Harris, 8 Cir., 5 F.2d 25, 29; Nicholas v. Oklahoma City Mailer's Union No. 30, Okl., 285 P.2d 399, 402; Jorgensen v. Pennsylvania R. Co., 38 N.J. Super. 317, 118 A.2d 854, 870; City of Mullens v. Davidson, 133 W.Va. 557, 57 S.E.2d 1, 6, 7, 13 A.L.R.2d 887; Utah Code Ann.1953, Vol. 5, § 45-2-3; Williams v. Standard-Examiner Pub. Co., 83 Utah 31, 27 P.2d 1, 14